In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3840

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JENNIFER K. HOWARD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:08-CR-81—**Theresa L. Springmann**, *Judge.*

ARGUED APRIL 22, 2010—DECIDED AUGUST 30, 2010

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge.* Jennifer Howard was convicted of access device fraud, wire fraud, mail fraud, and aggravated identify theft. She now appeals her convictions for wire fraud and mail fraud claiming that there was insufficient evidence to support the jury's finding that she had the specific intent to defraud two of the victims identified in the superceding indictment. We affirm.

## I. BACKGROUND

Jennifer Howard rented the residence at 205 Scott Street, New Haven, Indiana, from her grandmother, Shirley Myers. In the summer of 2007, Howard applied to the ITT Technical Institute in Fort Wayne, Indiana, for the academic period from September through December 2007. That same summer, Howard submitted an on-line student loan application request in the amount of $30,000 to First Marblehead Education Resources, located in Boston, Massachusetts.

In the application, Howard identified herself and her grandmother as co-borrowers. Howard provided personal identifying information for Myers, including her date of birth, social security number, phone number, and employment and income information. Howard claimed that both she and Myers had the same residential address, e-mail address, and telephone number. She also provided supporting documents, including three pay stubs for Myers, Myers's driver's license, a letter from ITT Tech regarding Howard's admission, and copies of Howard's social security card, driver's license, and a marriage license application for Howard. Howard requested that the funds be disbursed in a check made payable to her and her grandmother, rather than having the funds made payable to her and the school.

Sarah Kostas, a senior fraud investigator with First Marblehead, testified regarding the on-line loan application process. A majority of First Marblehead loans are submitted on-line. After a prospective borrower submits an application through the bank's website, it is assigned

a loan identification number. First Marblehead employees are then able to access and print the application. If the application is approved, the borrower is prompted to download the loan credit agreement package. The package contains details of the terms of the loan and includes the signature pages. Although the on-line application itself does not reference First Marblehead or The Education Resource Institute ("TERI"), the company that underwrites the loans, the credit agreement refers to TERI in two different sections, using identical language:

> I acknowledge that the requested loan is subject to the limitations on dischargeability and bankruptcy contained in Section 523 and then A(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan is made pursuant to a program funded in whole or part by the Education Resource Institute Inc., ("TERI"), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code.

After reviewing the package, the borrower is directed to execute the signature pages and fax or mail them back to First Marblehead. In the event the lender deems that supporting documentation is needed to approve the loan, a First Marblehead loan analyst communicates the request to the borrower by telephone. First Marblehead retains copies of all loan documentation.

First Marblehead approved the loan to Howard in late August 2007, based almost entirely on Myers's credit

worthiness. First Marblehead then processed the loan for Union Federal, printed the check in the amount of $30,000 made payable to Howard and Myers, and mailed the check to Howard. Although the funds were disbursed from a bank account held by TERI, Astrive appeared as the payor on the check. Neither First Marblehead nor TERI were referred to on the check, but a statement appearing below the endorsement line read as follows: "Borrower(s) signing above agree to repay this education loan as per Borrower's credit agreement." Kostas said that it was more likely than not that Howard knew, and certainly should have known, that Astrive was a loan program, Union Federal was the lender, First Marblehead processed the loan, and that TERI guaranteed the loan.

In fact, on three separate occasions Howard made changes to the loan that required her to sign and fax documents back to First Marblehead. At the conclusion of each iteration, First Marblehead would generate a new credit agreement and provide it to Howard for her signature. Union Federal Savings Bank, the lender, and Astrive, the undergraduate loan program, were refer- enced on the loan signature pages. Therefore, Howard should have read of these companies and their roles on at least three separate occasions. In the final documents, each signature page bore Howard's signature and a forged signature of Myers as co-signer.

After the loan was disbursed, Howard deposited the $30,000 into her Wells Fargo checking and savings bank accounts, rather than using it to pay her tuition. A short

time thereafter, on November 21, 2007, First Marblehead received a fraud notification alert in connection with Howard's loan from American Education Services ("AES"). AES serviced First Marblehead loans after they were disbursed by handling payments made on the loans and providing collection services when payments were not made. AES is the entity that appears on an individual's credit report for nonpayment of debt. Because of this role, AES realized that Howard's loan application was fraudulent. At the time of the alert, First Marblehead's amount at risk was $33,519, which included the amount of the loan plus interest.

Also in 2007, Howard applied for credit card accounts with Chase Visa and American Express using the 205 Scott Street, New Haven, address and Myers's name and personal information. Myers was at a Chase Bank branch on September 1, 2007, conducting personal business when the bank received a fraud notification alert regarding activity on Myers's account. It was then that Myers first learned of the credit card acquired in her name with the 205 Scott Street billing address.

The following month, a collection agency contacted Myers regarding unpaid payments due on the American Express account. Myers denied opening the account. American Express received a fraud notification alert on or about November 7, 2007.

Concerned and suspicious about these incidents, Myers ordered a copy of her personal credit report and learned of the $30,000 student loan in her name. Myers testified that she never gave permission to Howard or

otherwise authorized anyone to open the credit card accounts or to apply for the student loan.

Myers filed a report with the Allen County, Indiana, Sheriff's Department in November 2007. Based on the information in the report, Detective Orville Roberts interviewed Howard at the sheriff's department. Howard was properly advised of her rights, which she waived by signing a waiver form. Howard claimed to have opened the Chase Visa account, signed Myers's name to charge slips, and applied for the student loan all with Myers's permission. Howard denied any knowledge of the American Express account. Although Howard told Detective Roberts that she would fax the student loan paperwork to him the following day, Roberts never received it.

In August 2008, Postal Inspector Andrew Gottfried interviewed Howard. Inspector Gottfried advised Howard of her rights. Howard then admitted to signing Myers's name on the signature pages of the student loan application without Myers's permission, and to charging various amounts to the credit card accounts. She also admitted that the email addresses associated with the credit card accounts belonged to her.

A federal grand jury in the Northern District of Indiana issued a four-count indictment against Howard in October 2008. The indictment charged Howard with the following counts: (1) access device fraud in violation of 18 U.S.C. § 1029(a)(2); (2) wire fraud in violation of 18 U.S.C. § 1343; (3) mail fraud in violation of 18 U.S.C. § 1341; and (4) aggravated identify theft in violation

of 18 U.S.C. § 1028A. A superceding indictment was re-turned in June 2009, but no new offenses were charged. The superceding indictment named First Marblehead and TERI as the specific entities that fell victim to Howard's scheme.

The four-day jury trial began on August 11, 2009. Howard testified on her own behalf at the trial. Howard denied her statements to Inspector Gottfriend, and claimed to have opened and used the credit card accounts and the student loan with Myers's permission. After the close of the government's evidence, Howard moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. After both parties rested, Howard renewed her motion. The district court took both motions under advisement. The jury returned a guilty verdict on all four counts on August 14. The district court issued an order denying Howard's motion for a judgment of acquittal on August 17. Howard timely appealed.

## II. ANALYSIS

Howard argues on appeal that the district court erred in denying her motion for judgment of acquittal because there was insufficient evidence to convict her of wire fraud or mail fraud. Howard "faces a nearly insurmountable hurdle" when attacking the sufficiency of the evidence. *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009) (internal quotation marks omitted); *see also United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005) ("Sufficiency of the evidence challenges rarely

succeed because we owe great deference to the jury's verdict."). On a challenge to the sufficiency of the evidence, "we examine that evidence in the light most favorable to the government and will uphold the jury's verdict so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Garcia*, 580 F.3d 528, 534 (7th Cir. 2009) (internal quotation marks omitted). When conducting our review, "we do not weigh the evidence or assess the credibility of witnesses." *United States v. Khattab*, 536 F.3d 765, 769 (7th Cir. 2008) (internal quotation marks and alteration omitted).

In order to establish a violation of the mail or wire fraud statutes, the government must prove (1) that the defendant participated in a scheme to defraud; (2) with the intent to defraud; (3) and used the mail (for 18 U.S.C. § 1341) or interstate wire (for 18 U.S.C. § 1343) in furtherance of the fraud. *United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007).

The thrust of Howard's insufficiency of the evidence argument is that, in order to sustain a conviction for wire fraud or mail fraud, the government must have proven that she intended to defraud the actual victims, First Marblehead and TERI. Howard argues that because First Marblehead and TERI were identified in the charging instrument and then again in the jury instructions, the government was required to show that she specifically intended to defraud those individual victims. Howard contends that because there was no evidence to show that she knew the specific sources of

her student loan, no reasonable jury could have found her guilty of wire fraud or mail fraud. We find Howard's arguments unpersuasive, and we decline to raise the government's burden of proof to the level she proposes.

Under both statutes, "[i]ntent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002). "However, '[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself . . . .'" *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (alteration in original) (*quoting United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994)). We have previously determined, however, that this type of "fraud does not include an element requiring a contemplated harm to a specific, identifiable victim." *United States v. Henningsen*, 387 F.3d 585, 590 (7th Cir. 2004). We have also addressed the particularity of the indictment, holding that specific victims need not be identified. *United States v. Mizyed*, 927 F.2d 979, 981 (7th Cir. 1991).

By logical extension, we hold today that even if an indictment names particular victims, the government need not prove intent to harm those named victims. Although certainly the naming of First Marblehead and TERI in the superceding indictment was not good form, it was merely surplusage and did not raise the

government's burden of proof. *United States v. LaBudda*, 882 F.2d 244, 249-50 (7th Cir. 1989); *United States v. Greene*, 497 F.2d 1068, 1086 (7th Cir. 1974). It is sufficient that the government in this case proved that Howard intended to defraud the scheme's victims, whomever they were, and such intent was established by examining the circumstances of the scheme itself, not by who was specifically named in the indictment.

We also note that Howard's argument—that there was an improper variance between the indictment and what the government was required to prove at trial—is flawed for another reason. "A variance is fatal only when the defendant is prejudiced in [her] defense because [she] cannot anticipate from the indictment what evidence will be presented against [her] or [she] is exposed to double jeopardy." *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007) (internal quotation marks omitted).

Howard's trial strategy was to claim that she had her grandmother's authorization for the loan; it was not that Howard was totally unaware of the financial entities involved in the loan. In fact, when impeaching a detective, Howard's counsel stated, "We know this loan was not submitted to AES. This loan . . . was submitted to Union Federal who farmed it out to TERI who then submitted it to First Marblehead." (R. at 502-03.) It is obvious that the specific loan organization listed in the indictment could not have affected Howard's defense. Howard, therefore, cannot show that there was any prejudice to her defense because the government proved

Howard's intent to defraud the scheme's victims and not those specifically listed in the indictment.

In the same vein, the government's burden was not raised by the mention of First Marblehead and TERI in the jury instructions. We have held that "[t]he additional language in the [jury] instruction . . . which identified the victim of the scheme to defraud . . . was surplusage, [and] was not an element the government was required to prove." *United States v. Otto*, 850 F.2d 323, 326 (7th Cir. 1988). Similar to the wire fraud instruction in *Otto*, the instruction in this instance was a correct statement of the law under the wire fraud statute. The district court's mention of particular victims did nothing with respect to the necessary elements of wire fraud that the government was required to prove, and for the reasons previously discussed, the names were merely surplusage.

At the time of the motion for judgment of acquittal, the district court found that the record was replete with evidence from which a reasonable jury could find Howard intended to defraud the scheme's victims. The district court reasoned that:

> At least one of the loan documents, the loan application, put [Howard] on notice that the loan was subject to limits on dischargeability in bankruptcy because it was either a TERI loan, or was a qualified education loan as defined in the Internal Revenue Code. The evidence was that this document was routinely sent to loan applicants like [Howard]. There was also evidence that [Howard] had various contacts with First Marblehead as the processor

of the loan. The evidence related to the relationship among and between the different entities involved in processing, issuing, and guaranteeing the loan included testimony about Astrive and Federal Union, neither of which were identified in the Superceding Indictment. However, this evidence did not broaden the possible bases for conviction from that which appeared in the Superceding Indictment. All of the evidence presented at trial related to the same student loan, the same wire transfer, and the same mailing that were identified in Counts 2 and 3 of the Superceding Indictment. *The scheme proven was the scheme charged, and the Superceding Indictment was not constructively amended by the reference to the other financial entities that were involved with the loan.*

(R. 49, at p.2 (emphasis added).) Because we agree with the district court's reasoning and because we do not reweigh the evidence or revisit witness credibility, we see no value in rehashing the same reasoning here. Accordingly, we find that there was sufficient evidence in the record from which a reasonable jury could find that Howard intended to defraud the scheme's victims. We note also that because the aggravated identity theft conviction was dependent on Howard's guilt of either wire fraud or mail fraud, her conviction for aggravated identity theft stands.

We conclude that Howard failed to carry her burden on appeal and that the district court properly denied Howard's motion for judgment of acquittal.

### III. CONCLUSION

We therefore AFFIRM Howard's convictions.