In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2399

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FELIX DANIEL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 743 — **Joan B. Gottschall**, *Judge.*

ARGUED NOVEMBER 7, 2013 — DECIDED APRIL 15, 2014

Before BAUER, MANION, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury found defendant-appellant Felix Daniel ("Daniel") guilty of one count of wire fraud in violation of 18 U.S.C. § 1343, and three counts of mail fraud in violation of 18 U.S.C. § 1341. Daniel filed post-trial motions seeking: (1) a new trial based on the district court's refusal to instruct the jury that there must be specific unanimity on at least one false representation, and (2) judgment of acquittal based on the insufficiency of the evidence. The district court

denied the motions and entered a final judgment of conviction. Daniel timely appealed to this court. We affirm the ruling of the district court.

## I. BACKGROUND

The government charged Daniel with three counts of mail fraud and one count of wire fraud based on his involvement in a failed business endeavor called Rym Technology Holdings, LLC ("Rymtech"). Rymtech was a mortgage reduction program that purported to provide financial assistance to homeowners facing foreclosure. Daniel, in his role as Rymtech's Vice President of Sales and Marketing, would recruit homeowners to place their property in the Rymtech program and arrange a closing at which the homeowners would sign over the title of their property to straw purchasers called "A buyers." Homeowners were told that their home would be placed in a trust and that the A buyers would obtain financing from mortgage lenders to pay off the mortgage on the property. Daniel instructed Rymtech loan officers to prepare fraudulent loan applications on behalf of the A buyers in order to acquire financing for each property.

Rymtech promised homeowners that after five years, they would regain title to their properties free and clear of any mortgage. This was an empty promise; even if Rymtech had invested all of the homeowners' equity, Rymtech would have to receive implausibly high rates of return in order to make the necessary mortgage payments. In fact, the money Rymtech obtained from homeowners' equity checks was primarily used to operate the company itself; only a small portion of the funds was actually invested. When the program's finances started to

disintegrate, Daniel nevertheless continued to recruit home-owners and to choose which properties would or would not receive payments. Ultimately, Rymtech had insufficient revenue to cover its mortgage obligations, and the program failed.

Daniel's indictment charged that on November 19, 2004, he caused a transfer of funds over interstate wires representing the proceeds of a mortgage loan for an A buyer's purchase of a homeowner's property. Three additional counts charged Daniel with sending letters, from Rymtech to homeowners, through the United States mail. These letters were used to convince homeowners that their properties remained secure and that Rymtech was continuing to make mortgage payments. A jury trial on all four counts began on March 11, 2013.

At trial, homeowners testified that Daniel persuaded them to put their property in the program and that he was present at meetings where they signed over the title to their property to Rymtech. The homeowners also testified that Rymtech representatives told them that their homes would be safe and placed in a trust. When some homeowners discovered that their homes were being foreclosed or that their property taxes had not been paid, Daniel assuaged their concerns by assuring them that their homes were safe.

The homeowners testified that in March and November 2006, they received letters in the mail from Rymtech regarding the status of their properties. These letters directed homeowners to continue making payments to Rymtech and falsely represented that Rymtech was making payments on their mortgages and would continue to do so. One homeowner

testified that she exchanged emails with Daniel in late 2006 and early 2007, asking him for an update on her home. Although Daniel was aware at this time that the Rymtech program was failing, Daniel's reply email stated, "[w]e should have money any day now, very, very soon, looking forward to getting [things] back on [track] and resolved."

Dimona Ross ("Ross"), a loan officer hired by Daniel, testified that Daniel played an integral role in recruiting properties for participation in the program and matching the properties with A buyers. Daniel told Ross that he created an investment strategy that would pay off the mortgages and claimed a patent was pending on that system; Ross was thus under the impression that Daniel developed and ran the Rymtech program. Daniel instructed Ross to falsify loan applications for Rymtech, including misrepresenting investors' intentions for the properties to be purchased and fraudulently listing properties as second homes or investment properties. Occasionally, Daniel gave Ross "manufactured" leases to submit with the loan applications that listed fake tenants and falsely represented that an A buyer was collecting rent on the property. Daniel directed other Rymtech loan officers to prepare similar fraudulent applications for properties entrusted to the program as well.

Two A buyers who spoke directly with Daniel testified that Daniel recruited them to participate in the Rymtech program, telling them that their credit would be used to help struggling homeowners. Daniel told A buyers that they would not have to make any of the mortgage payments themselves. The A buyers purchased properties from the Rymtech program and received $1,500 per transaction. Based on the fraudulent loan

applications created at Daniel's direction, mortgage lenders would wire funds to the title company in order to close on the A buyers' property acquisitions. At trial, a senior special investigator from the Federal Reserve Bank of New York confirmed that on November 19, 2004, a wire transfer was initiated from Eva Breckenridge, one of the testifying A buyers, to a title company. The A buyers stated that when they received calls from lenders informing them of late payments on the mortgages, Daniel told them Rymtech was waiting for returns on its investments to make the payments.

The owner of a property management company, Anthony Brown ("Brown"), testified that his company took over property management for Rymtech. Brown explained that rent payments from the homeowners and money wired from Rymtech to the property management company was used to make monthly mortgage payments on the properties. Brown testified that Rymtech failed to pay taxes and insurance on the properties, and that by late 2005, Rymtech failed to wire enough funds to cover the monthly mortgage payments. Nonetheless, Daniel continued to recruit homeowners and began directing Brown's company to make mortgage payments only on certain properties. Whenever Brown's company received complaints from homeowners, they were directed to Daniel. By the end of 2006, Brown's company was forced to cease operations with Rymtech due to a lack of funding.

Additional evidence at trial established that Rymtech was registered as an LLC in Michigan, with Daniel listed as a registered agent and member-manager. A provisional patent application filed by Rymtech entitled "mortgage financial intervention system and method" identified Daniel as an

inventor. An FBI employee with 21 years of experience as a financial advisor testified as an expert about Rymtech's investment strategy. He stated that in order for Rymtech to have kept its promise to pay off homeowners' mortgages within five years, the program would have needed to invest all of the program's funds and realize an implausibly high compounded annual growth rate of return. The expert further testified that he analyzed Rymtech's bank records and determined that approximately 85% of the program's funds was spent on operations; only approximately 6% was invested.

During the final jury instruction conference, the parties discussed the government's proposal of a jury instruction for proof of a scheme to defraud prepared by the Committee on Federal Criminal Jury Instructions of the Seventh Circuit. When a defendant is charged with violations of 18 U.S.C. §§ 1341 and/or 1343, the Pattern Criminal Jury Instructions of the Seventh Circuit (2012) provide for the following:

> In considering whether the government has proven a scheme to defraud, the government must prove that one or more of the [false or fraudulent pretenses, representations or promise] [bribes or kickbacks] charged in the portion of the indictment describing the scheme be proved beyond a reasonable doubt. The government, however, is not required to prove all of them.

Daniel requested Pattern Criminal Jury Instruction 4.04, requiring the jury to agree unanimously on a specific fraudulent representation, pretense, promise, or act. The government objected, arguing that unanimity is only required for the

existence of the scheme itself and not in regard to a specific false representation. The district court agreed with the government and declined to include Pattern Criminal Jury Instruction 4.04. Daniel objected, but did not present any other instruction regarding unanimity. The court overruled Daniel's objection.

The jury returned a guilty verdict against Daniel on all counts. After trial, Daniel filed a motion requesting a new trial, arguing that the court erred when it failed to give the jury a specific unanimity instruction. Daniel filed a separate motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 arguing that the evidence presented at trial was insufficient for a jury to find him guilty beyond a reasonable doubt. The district court denied both post-trial motions and entered a final judgment of conviction.

## II. DISCUSSION

### A. Specific Unanimity Instruction

On appeal, Daniel contends that a new trial should be granted based upon the district court's denial of his request for a specific unanimity instruction. "We review *de novo* whether jury instructions accurately summarize the law, but give the district court substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013) (internal quotations omitted). If we determine that the instructions accurately summarize the law, this court reviews the district court's phrasing of the instruction for abuse of discretion. *Id.* Reversal is warranted only where the reviewing court is "left with the definite and firm

conviction that a mistake has been committed." *United States v. Reese*, 666 F.3d 1007, 1021 (7th Cir. 2012).

Wire fraud under § 1343 requires the government to prove beyond a reasonable doubt that Daniel: (1) participated in a scheme to defraud, (2) intended to defraud, and (3) used interstate wires in furtherance of the fraudulent scheme. *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012). The same elements must be proved to establish mail fraud under § 1341, except that the United States mail system, rather than interstate wires, must have been used in furtherance of the fraud for the third element of the scheme. *United States v. Seidling*, 737 F.3d 1155, 1159 (7th Cir. 2013).

Here, the district court instructed the jury that the government bore the burden to prove the essential three elements of mail and wire fraud beyond a reasonable doubt for each count and tendered the Pattern Criminal Jury Instruction for 18 U.S.C. §§ 1341 and 1343. Daniel argues that the jury should have been instructed with Pattern Criminal Jury Instruction 4.04 requiring unanimity as to a specific fraudulent act or representation. We disagree.

The Supreme Court has held that while a jury's unanimity is required in regard to each principal element of a criminal offense, "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible *means* the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999) (emphasis added). Although this court has yet to specifically address the use of specific unanimity instructions on a scheme to defraud,

three of our sister circuits have held that a single false representation or omission used to execute a fraudulent scheme is properly characterized as a *means* to executing the scheme, rather than one of the necessary *elements* of the mail or wire offense that do require unanimity. *United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013) ("A jury, faced with divergent factual theories in support of the same ultimate issue, may decide unanimously … that the government has proven a scheme to defraud even if they may not be unanimous as to the precise manner in which it occurred."); *United States v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012) (Jurors were properly instructed "that they needed to agree that one of the means had been used [to defraud victims], but that not all needed to agree on the same one."); *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007) (holding that in a scheme to defraud, "the jury need not be unanimous on the particular false promise").

Here, the three elements of wire fraud are clearly articulated in the criminal statute itself: (1) an intent to defraud, (2) participation in a scheme to defraud, and (3) the use of interstate wires in furtherance of the scheme to defraud. *Sheneman*, 682 F.3d at 628. We agree with the reasoning of these circuits and find that the fraudulent representations or omissions committed by Daniel were "underlying brute facts" of the verdict against him: that is, they were merely the means he used to commit an element of the crime. We conclude that the instructions used in this case accurately conveyed the law and were all that was necessary. Thus, the district court did not abuse its discretion when it declined to give the additional specific unanimity instruction Daniel requested.

### B.  Sufficiency of the Evidence

Daniel also moves for judgment of acquittal arguing that there was insufficient evidence presented at trial to establish his mail fraud and wire fraud convictions. He first contends that the government failed to present sufficient evidence at trial showing he had the requisite criminal intent to commit fraud via interstate wires or the United States mail system. Daniel argues that the evidence at trial shows that his involvement with Rymtech was limited to the "front end" of the business, namely marketing and sales, and that he did not have knowledge of or participate in the management of the program's accounts or Rymtech's investment strategy. Daniel claims that the government's witness, Ross, was not credible and that his guilt was based on mere suspicion and speculation. We disagree.

The element of intent in a scheme to defraud requires "a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *Sheneman*, 682 F.3d at 629 (quoting *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010)). "[S]pecific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself." *Id.* at 727.

At trial, the government presented testimony from witnesses who spoke directly with Daniel on numerous occasions, including homeowners that participated in the Rymtech program; two A buyers; loan processor Ross; and Brown, the head of the property management company working with Rymtech. Their testimony made apparent that Daniel played

a crucial role in inducing homeowners to enter the scheme and keeping them in the program when they became concerned about the efficacy of the program. The expert testimony from the FBI agent with experience in financial advising solidified what Daniel already knew: that it was a practical impossibility for his investment strategy to succeed even if all of the homeowners' equity had been invested.

Physical evidence presented by the government included bank records, agreements signed by Daniel, letters sent by Rymtech to homeowners, print-outs of portions of the Rymtech website claiming that homeowners "absolutely" could not lose their homes in the program, and public records identifying Daniel as the "inventor" of the Rymtech investment strategy as well as Rymtech's registered agent and member-manager. Combined with the witnesses' testimony, the evidence at trial showed that Daniel was aware of Rymtech's financial problems and wilfully misrepresented that he had a sound investment strategy that would pay off the mortgages on time. While Daniel argues that a person of ordinary intelligence would not have known that Rymtech's investment strategy was likely to fail, it was reasonable for the jury to infer that Daniel was aware that the small percentage of equity actually invested by Rymtech would not produce enough returns to pay off the outstanding mortgage payment obligations. Viewing the evidence in the light most favorable to the government, there was ample circumstantial evidence from which a reasonable jury could find that Daniel wilfully deceived homeowners and lenders.

Daniel also argues there was insufficient evidence to prove that he personally caused letters to be mailed to homeowners.

However, the jury is not required to find that Daniel personally mailed the letters, but rather that the use of the United States mail system was reasonably foreseeable to him and that an actual mailing occurred in furtherance of the scheme. *United States v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995). Evidence at trial established Daniel's intimate involvement with the Rymtech program from the recruitment of homeowners and A buyers to the management of the program's dwindling funds. Combined with homeowners' testimony regarding Daniel's communication with them via phone and email specifically pertaining to the mailed letters, there was sufficient evidence for the jury to conclude that it was reasonably foreseeable to Daniel that the United States mail system would be used to deliver letters to homeowners in furtherance of the scheme.

In sum, abundant evidence at trial established that Daniel was the primary spokesman at Rymtech meetings, was occasionally present at closings, and signed documents on behalf of Rymtech, including fraudulent loan applications prepared at his direction. Testimony showed that Daniel repeatedly made false or misleading statements to homeowners before and after placing their homes in the Rymtech program, even after he was aware of the program's failing investment strategy. We therefore conclude that the direct and circumstantial evidence presented at trial was more than sufficient to support the jury's inference that Daniel deliberately misrepresented Rymtech's financial situation in order to defraud homeowners and lenders through the use of the United States mail and interstate wires.

### III.  CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.